

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-16-00058-CR

---

THOMAS DIXON, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

---

On Appeal from the 140th District Court
Lubbock County, Texas
Trial Court No. 2012-435,942, Honorable Jim Bob Darnell, Presiding

---

January 13, 2022

## MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Appellant, Thomas Dixon, a former Amarillo plastic surgeon, was indicted on two counts of capital murder for the July 10, 2012 death of Lubbock physician, Joseph Sonnier, M.D.[1] The State did not seek the death penalty. Following a mistrial, the case was retried; a second jury found Appellant guilty on both counts of capital murder. The

---

[1] *See* TEX. PENAL CODE ANN. §§ 19.03(a)(3) (murder for remuneration), 19.03(a)(2) (murder in the course of burglary) and 7.01 (parties to offense), 7.02 (criminal responsibility for conduct of another); 12.31(a)(2) (punishment for capital felony-life without parole).

trial court imposed the obligatory sentence of life in prison without parole on each count. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1; TEX. PENAL CODE ANN. § 12.31(a)(2).

Appellant challenged his convictions via fifty issues. In *Dixon v. State*, 566 S.W.3d 348 (Tex. App.—Amarillo 2018)*, rev'd,* 595 S.W.3d 216 (Tex. Crim. App. 2020), we overruled Appellant's sufficiency-of-the-evidence challenges (Issues 1-2), but sustained his issues challenging the trial court's denial of his motion to suppress historical cell site location information obtained without a warrant (Issues 43-47) and exclusion of the public from the courtroom (Issues 11-16). On the State's petition for discretionary review, the Court of Criminal Appeals reversed our judgment as to the cell site location data and closed courtroom grounds and remanded for our consideration of Appellant's remaining issues. *Dixon v. State,* 595 S.W.3d 216 (Tex. Crim. App. 2020).[2]

On remand, we now address the remaining issues (Issues 3-10, 17-42, 48-50). We sustain Dixon's 17th issue complaining that two convictions for a single offense violate his Fifth Amendment right to be free from double jeopardy; we therefore reverse and render a judgment of acquittal for the offense charged under the second count of the indictment, *viz.*, murder "in the course of committing or attempting to commit the offense of burglary of a habitation of Joseph Sonnier, III."

We overrule Appellant's remaining issues and affirm Appellant's conviction for capital murder under the first count of the indictment, specifically that Dixon intentionally

---

[2] After remand to this Court from the Court of Criminal Appeals, Dixon filed motions titled "Appellant's Motion to Stay Proceedings and Further Review of his Case on Appeal Pending the Filing and Disposition of a Petition for Writ of Certiorari or in the Alternative to Expedite Oral Arguments" and "Appellant's Motion to Withdraw his Motion to Stay Proceedings and Further Review of his Case on Appeal Pending the Filing and Disposition of a Petition for Writ of Certiorari [and to Expedite Hearing on the Remaining Issues Presented on this Appeal]." We deny those motions as moot.

or knowingly caused the death of Sonnier by employing David Shepard to murder Sonnier "for remuneration or the promise of remuneration, from the defendant . . ." *See* TEX. PENAL CODE ANN. § 19.03(a)(3). Because Dixon's conviction of murder for remuneration stands, we affirm Dixon's sentence of imprisonment for life without the possibility of parole.

## Background

This Court's 2018 opinion, which held that legally sufficient evidence supports the jury's guilty verdict, provides additional detail of the evidence presented at trial. Though the Court of Criminal Appeals reversed this Court's judgment on other grounds, it upheld the legal sufficiency holding. We therefore discuss only the facts that are relevant to the remaining issues on remand.

Dixon, an Amarillo resident, divorced his wife after he began a relationship with Richelle Shetina. In time, the relationship waned and Shetina began seeing Joseph Sonnier, who lived in Lubbock.

Dixon and his friend and business associate, David Shepard, conversed for at least three months in 2012 regarding plans for dealing with Sonnier. On July 10, 2012, Shepard entered Sonnier's Lubbock home through a rear window. Shepard killed Sonnier by shooting him five times and stabbing him eleven times.

Dixon was aware Shepard was at Sonnier's home on July 10; the two regularly messaged each other while awaiting Sonnier's arrival home that evening. Dixon contends he thought Shepard was at the home to install a camera that would reveal Sonnier's

3

alleged unfaithfulness to Shetina. The State contends this evidences Dixon's knowledge and intention for Shepard to kill Sonnier on July 10.

Before Shepard killed Sonnier, Dixon had paid Shepard with three bars of silver. The State contends the silver had been paid to Shepard as consideration for agreeing to kill Sonnier. Dixon contends payment was for his investment in Physician Ancillary Services, Inc. (PASI), an allergy testing business partnered by the men. On July 11, 2012, with Dixon's consent, Shepard sold at least one bar of silver at a pawn shop in Amarillo. After Shepard killed Sonnier, Shepard returned to Amarillo where Dixon gave him three cigars.

On July 11, Sonnier's body was discovered, and Shetina named Dixon as one who should be further questioned. Lubbock police detectives Zach Johnson and Ylanda Pena drove to Amarillo on the evening of July 11 to interview Dixon and his girlfriend, Ashley Woolbert. Dixon initially denied knowing Sonnier, a statement Dixon admitted at trial to be a lie. When Detective Pena asked Dixon about the identity of "Dave," a name revealed in a conversation with Woolbert, Dixon identified Shepard and provided Shepard's telephone number. Dixon related that Shepard had been at Appellant's home the prior day to get cigars but did not disclose he knew Shepard had been at Sonnier's home.

Immediately after his interview with detectives, Dixon communicated with Shepard more than a dozen times through the evening of July 11 and morning of July 12, including the period immediately before and after detectives reached out to speak with Shepard about Sonnier's death.

4

Shepard attempted suicide at least twice during the initial days following Sonnier's murder. On the evening of July 14, following one failed suicide attempt, Dixon met Shepard at Appellant's medical office in Amarillo and stitched Shepard's left wrist. Around the same time, Dixon "took measures to try to get rid of my messages" with Shepard. Dixon first deleted the messages from the phone. He also got into a swimming pool with his phone; when the water failed to destroy the phone, he removed its SIM card. What Dixon did not realize at the time was that his phone had already synced some of the messages with his computer.

On July 15, 2012, Paul Reynolds, Shepard's roommate, contacted the Lubbock Crime Line and related that Shepard and Dixon were involved in Sonnier's murder. Dixon and Shepard were arrested the following day. Later, Shepard led police to an Amarillo lake, where they recovered the pistol he said he used to shoot Sonnier. The pistol was owned by Dixon.

Shepard pled nolo contendere to the capital murder of Sonnier. Under the terms of a plea-bargain agreement, he was sentenced to confinement in prison for life without parole. At Appellant's first trial, during the State's case-in-chief, Shepard testified Appellant did not hire him to murder Sonnier. As noted, that trial ended in a hung jury.

In Dixon's second trial, Shepard was present and available to be called as a witness. However, Shepard was never called to the stand.

**Analysis**

**Part I: Double Jeopardy**

By his seventeenth issue, Dixon complains he was twice convicted for the murder of Sonnier in violation of the Fifth Amendment's Double Jeopardy Clause.[3] The State concedes the issue must be sustained. As noted, Dixon was charged and prosecuted for Sonnier's death under two capital murder theories: Count 1, murder for remuneration; and Count 2, as a party to murder committed in the course of a burglary. *See* TEX. PENAL CODE ANN. §§ 19.03(a)(3), 19.03(a)(2) and 7.01. The jury found Appellant guilty on both counts.

The Double Jeopardy Clause protects criminal defendants from, among other things, multiple punishments for the same offense. *Ex parte Milner,* 394 S.W.3d 502, 506 (Tex. Crim. App. 2013) (citing *Brown v. Ohio,* 432 U.S. 161, 164-65, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977)). Dixon's two convictions for murdering Sonnier is violative of his double-jeopardy protections from being twice convicted for the same offense. *See Reyna v. State,* No. 13-12-00484-CR, 2014 Tex. App. LEXIS 475, at *7-8 (Tex. App.—Corpus Christi Jan. 16, 2014, pet. ref'd) (mem. op., not designated for publication). When, as here, a defendant is twice convicted of the same offense and both offenses carry the same punishment, a reviewing appellate court may strike either conviction. *See Martinez v. State,* 225 S.W.3d 550, 555 (Tex. Crim. App. 2007). In this case, we render a judgment of acquittal for the offense charged under Count 2 of the indictment, murder in the course

---

[3] U.S. CONST. amend. V.

6

of committing burglary. We sustain Appellant's seventeenth issue and examine Dixon's remaining issues as they relate to Count 1 of the indictment (murder for remuneration).

## Part II: Admission / Exclusion of Evidence

Via ten issues (Issues 3-10, 21-22), Dixon complains he was harmed by the trial court's erroneous admission or exclusion of certain evidence detailed further below. A trial judge has wide discretion in the admission of evidence at trial. *Druery v. State,* 225 S.W.3d 491, 502 (Tex. Crim. App. 2007). We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Davis v. State,* 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). In applying the standard, we do not disturb the trial court's decision if the ruling was within the zone of reasonable disagreement. *Id.* If the trial court's ruling admitting evidence is correct under any applicable theory of law, we will not disturb it, even if the trial court gave a wrong or insufficient reason for the ruling. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

### Admission of Evidence Regarding Statements by Shepard, and Communications between Dixon and Shepard (Issues 3, 4, 5, and 6)

Through issues three, four, and five, Dixon complains the State never called Shepard to testify, but the court permitted the jury to hear out-of-court statements by Shepard and others to prove Dixon's guilt. Appellant contends Shepard's statements constituted inadmissible hearsay and that other witnesses' references to Shepard's remarks violated Dixon's right to confrontation under the Sixth Amendment. In his sixth issue, Dixon complains the trial court erred in allowing "incomplete misleading hearsay text messages" between Appellant and Shepard to be admitted, in violation of the hearsay rule and Rule of Evidence 403.

7

A. Admissibility of Hearsay Statements by Shepard Regarding Dixon's Role in Murder for Remuneration Plan

Dixon was the first to elicit hearsay testimony about what Shepard said to Detective Johnson during the murder investigation. Pursuing a trial theme that Reynolds, not Appellant, assisted and encouraged Shepard to murder Sonnier, Dixon's counsel asked Detective Johnson whether Shepard had implicated Reynolds when discussing the murder. Johnson said Shepard had implicated Reynolds. During redirect examination, Johnson was then asked whether Shepard had implicated anyone else. Dixon lodged no objection during the following exchange:

> Q. You were asked whether David Shepard had implicated Paul Reynolds in this murder?
>
> A. Yes, sir.
>
> Q. Did David Reynolds — I mean, did David Shepard implicate Mike Dixon in this murder?
>
> A. Yes, sir, he did.

Only when the State asked Johnson for details of Dixon's alleged involvement in the murder did Appellant object.[4]

Reynolds also took the stand and testified[5] about Dixon's role in assisting Shepard in murdering Sonnier. The following exchange with the State's attorney occurred:

> Q. Did you give [Shepard] any advice about how to kill someone?

---

[4] No objection under the Confrontation Clause was made.

[5] Prior to Reynolds taking the stand, counsel for Dixon lodged a hearsay objection. The district court ruled, "I'm going to allow him to testify about what was said, not any statements that he made." Counsel later urged an objection under the Confrontation Clause. No ruling was obtained.

A. No.

Q. Did [Shepard] tell you anything about — . . . let me ask you this first. Did he tell you anything about the Defendant paying him to do this?

A. Yes, he did.

Q. And what did he tell you about that?

A. He said Dixon paid him in silver bars, three silver bars for it . . .

Q. And, again, you relayed this to law enforcement when you gave your statement; is that correct?

A. I believe so.

Q. And Shepard told you that he had — that the Defendant had given him -- or was giving him three silver bars to do this?

A. That's correct.

Q. Did he even tell you what a value that was?

A. He said he thought the bars were worth about $3,000.00 a piece, $9,000.00.

Counsel for the State later clarified with Reynolds about what he understood Shepard had agreed to perform in exchange for the silver bars. Counsel asked, "Let's go back to these silver bars that Shepard had told you about. He said the Defendant gave him three silver bars for this murder. Is that what your understanding is?" Reynolds replied, "That's what he said." In addition, when the prosecutor asked Reynolds how Shepard obtained the gun used to shoot Sonnier, he responded Shepard had said, "Mike Dixon gave it to him."

During further cross-examination, *Dixon* introduced into evidence a transcript of the detectives' recorded interview of Reynolds to identify inconsistencies with his testimony. This exhibit also documents Reynolds saying that Shepard admitted Dixon

9

was involved in Sonnier's murder; that Dixon paid three bars of silver to Shepard; and that Dixon provided the gun used to shoot Sonnier. Dixon's attorney also elicited the following testimony from Reynolds:

> Q. And you knew that [Mike Dixon's] investment in the allergy business was the silver bars, didn't you?
>
> A. Oh, no, not at all.
>
> Q. So you told Mike that Dave paid to kill — that Mike paid Dave to kill Dr. Sonnier. That's what you told the police?
>
> A. That's what Shepard told me.

We hold the trial court did not commit reversible error in admitting evidence regarding what Shepard said about Dixon's role in murdering Sonnier, that the gun used to shoot Sonnier was owned by Dixon, and that Dixon paid Shepard with three silver bars as remuneration for Sonnier's murder. First, despite efforts by Dixon to assert hearsay and Confrontation Clause objections to some testimony regarding what Shepard told others, the same evidence of Dixon's remuneration and agreement with Shepard was presented to the jury at other times without a timely objection. Dixon even introduced some of this evidence by his questions and an admitted exhibit. Thus, no reversible error is presented. *Taylor v. State*, 109 S.W.3d 443, 449 n.25 (Tex. Crim. App. 2003) ("Where the same evidence or argument is presented elsewhere during trial without objection, no reversible error exists."); *Moore v. State,* No. 07-13-00270-CR, 2014 Tex. App. LEXIS 4517, at *3 (Tex. App.—Amarillo Apr. 24, 2014, no pet.) (per curiam) (mem. op., not designated for publication) (alleged error regarding the admission of evidence "is cured

10

when the same evidence comes in elsewhere without objection"). *See also* TEX. R. APP. P. 33.1(a)(1)(A).[6]

Second, even if Dixon had preserved his hearsay objections to statements by Shepard regarding Dixon's alleged agreement to murder Sonnier, Reynolds's testimony about what Shepard said would be proper under the statement-against-interest exception to the hearsay rule. *See* TEX. R. EVID. 803(24); *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999) (noting that "[a] statement which is self-inculpatory can be admissible against a defendant who was not the declarant of the statement.").[7] Under that statement-against-interest exception, Shepard's statements as related by Reynolds from the stand are admissible under the Rules of Evidence if:

> (A) a reasonable person in [Shepard's] position would have made [the statement] only if [Shepard] believed it to be true because, when made, it was so contrary to [Shepard's] proprietary or pecuniary interest or had so great a tendency to . . . expose [Shepard] to civil or criminal liability or to make [Shepard] an object of hatred, ridicule, or disgrace; and
>
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose [Shepard] to criminal liability.

---

[6] This same rule also demonstrates the absence of error in the trial court's admission of testimony from Haley Shepard (David Shepard's daughter), who testified Shepard said he "did some work for [Appellant] and he paid me early." Shepard also allegedly instructed his daughter not to ask about the type of work he had performed. However, Appellant elicited the same testimony from Haley Shepard, curing any error posed by the jury's hearing this testimony.

[7] Johnson's testimony about what Reynolds told him Shepard had said constitutes hearsay within hearsay. TEX. R. EVID. 805 (permitting admissibility of hearsay within hearsay if "each part of the combined statements conforms with an exception to the rule."). Excepting what Shepard told Reynolds from the hearsay rule per TEX. R. EVID. 803(24) does not address that Reynolds's out-of-court statements to Johnson also constitute hearsay. Any error in admitting Johnson's statements, however, are harmless given that the same information came in through a variety of other sources, including through Reynolds and Dixon's admission of the interview transcript.

*See* Tᴇx. R. Eᴠɪᴅ. 803(24).  When assessing whether there are sufficient corroborating circumstances that clearly indicate the statement's trustworthiness, the Texas Court of Criminal Appeals provides that the trial court should consider: (1) whether the declarant's guilt is inconsistent with the defendant's guilt, (2) whether the declarant was so situated that he might have committed the crime, (3) the declaration's timing, (4) the declaration's spontaneity, (5) the relationship between the declarant and the party to whom the statement is made, and (6) the existence of independent corroborative facts.  *Love v. State*, No. AP-77,085, 2021 Tex. Crim. App. Unpub. LEXIS 187, at *78 (Tex. Crim. App. Apr. 14, 2021); *Dewberry*, 4 S.W.3d at 751.  When, as here, Shepard's statements are being offered by the State to inculpate Dixon, the first two factors are "not relevant."  *Id.* (citing *Woods v. State*, 152 S.W.3d 105, 113 (Tex. Crim. App. 2004)).

We hold Reynolds's testimony about statements attributed to Shepard constitute admissible statements against interest, as they subjected Shepard to criminal liability for murder for remuneration.  Moreover, we hold the statements bear sufficient indicia of trustworthiness.  Shepard spontaneously made the statements to Reynolds, whom Dixon describes in his brief as Shepard's "roommate, life-long friend, and best man at his wedding," mere days after the murder and during a time Shepard was experiencing signs of personal distress.  *See Woods*, 152 S.W.3d at 113 (holding that the timing and spontaneity of statements against interest tend to establish their reliability).  When a declarant makes incriminating statements to individuals with whom he shares a close relationship, there exist fewer trustworthiness concerns than if the statement had been made to someone outside his circle, such as members of law enforcement.  *See Love*, 2021 Tex. Crim. App. Unpub. LEXIS 187, at *78 (incriminating statements made by

12

declarant to friends and cousin whom declarant sought to recruit into murder-for-hire scheme bore sufficient indicia of trustworthiness in murder trial against co-conspirator); *Hernandez v. State*, No. 13-17-00271-CR, 2018 Tex. App. LEXIS 5766, at *19-20 (Tex. App.—Corpus Christi July 26, 2018, pet. ref'd) (mem. op., not designated for publication) (admission by declarant to fellow gang member that he, in conjunction with co-conspirator, had robbed game room was sufficiently trustworthy as an admissible statement against interest in criminal trial against co-conspirator for engaging in organized criminal activity and aggravated assault).

Third, abundant evidence also independently corroborates Shepard's statements regarding a murder for remuneration agreement with Dixon, including (1) Dixon's testimonial admission that he paid Shepard in silver bars; (2) with Dixon's permission, Shepard sold one of the bars the day after Sonnier's murder; (3) Dixon communicating with Shepard throughout the time he knew Shepard was at Sonnier's home leading up to the murder; and (4) the pistol Shepard said he used to shoot Sonnier belonged to Dixon. Shepard's hearsay statements that Dixon paid Shepard three bars of silver to murder Sonnier was therefore admissible as a statement against interest. *See* TEX. R. EVID. 803(24).

## B. Dixon's Right to Confront Shepard Regarding his Statements of the Murder for Remuneration Plan

The Sixth Amendment's Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington,* 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). "Testimonial"

13

statements include those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52. At minimum, testimonial statements pertain "to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. On the other hand, remarks made under more informal circumstances, such as those to family members or friends, are generally not testimonial under the Confrontation Clause. *Id.* at 52; *Woods,* 152 S.W.3d at 113 (declarant's statements about murder to acquaintances at coffee shop were non-testimonial); *Mata v. State,* No. 04-07-00146-CR, 2008 Tex. App. LEXIS 5084, at *18 (Tex. App.—San Antonio July 9, 2008, pet. ref'd) (mem. op., not designated for publication) (declarant's statements to vehicle passengers that he had shot a girl in the head held to be non-testimonial); *Gongora v. State*, 214 S.W.3d 58, 61 (Tex. App.—Fort Worth 2006, pet. ref'd) (declarant's admission to fellow gang member that he and appellant took part in murder held to be non-testimonial).

Shepard's admissions to Reynolds about murdering Sonnier pursuant to his agreement with Dixon did not violate Appellant's rights under the Confrontation Clause because they were non-testimonial, and because Dixon failed to preserve error to each statements' admission with a specific, timely objection. TEX. R. APP. P. 33.1(a). Further, Shepard's other statements, including those he made to law enforcement,[8] are cumulative of those that were otherwise admitted at trial or are merely tangential to the

---

[8] These include Shepard's statements concerning the following: (1) the route Shepard took from Amarillo to Sonnier's home in Lubbock; (2) Shepard's concern that his cell phone would disclose his location; (3) the route Shepard took to avoid highway cameras; (4) Shepard's awareness of "burner phones"; and (5) Appellant's destruction of his old computer and obtaining a new computer "'to cover his tracks.'"

14

evidence of the murder-for-hire agreement. *McNac v. State,* 215 S.W.3d 420, 424-25 (Tex. Crim. App. 2007) (finding no harm beyond a reasonable doubt when unchallenged evidence was cumulative of evidence admitted in violation of the Confrontation Clause); Tex. R. App. P. 44.2(a). The trial court did not commit reversible error in allowing the jury to receive Shepard's out-of-court statements detailing Dixon's role in the plot to murder Sonnier.

C. Hearsay / Unfair Prejudice Objections Regarding Dixon's Text Messages with Shepard

In his sixth issue, Dixon complains the trial court erred in allowing "incomplete misleading hearsay text messages" with Shepard to be admitted, in violation of the hearsay rule and Rule of Evidence 403. Documentary evidence and Dixon's own testimony show that before and on the day Shepard murdered Sonnier, Appellant and Shepard were communicating over their mobile phones via text message. Appellant testified that a few days after the murder, in an effort to conceal his messages from law enforcement, he attempted to delete all messages from his mobile phone. When that effort was not fruitful, Dixon entered his swimming pool with the phone to attempt to destroy the messages.[9] Appellant later removed the phone's SIM card and placed it in another mobile phone. Unbeknownst to Dixon, his phone had already synced with his laptop computer, where at least some of his messages were saved and later recovered.

At a hearing outside the presence of the jury, Dixon argued the messages constituted hearsay, violated his right to confrontation, and were misleading due to the

---

[9] On cross-examination by Dixon, Lubbock police detective Trent McNeme similarly testified that Shepard told him Dixon obtained a new computer for the purpose of "cover[ing] tracks."

15

absence of some deleted messages.  An expert called by the State was unable to recover additional data from Dixon's phone because it had been reset to its factory settings.  At trial, Dixon took the stand in his own defense and sought to explain the meaning of his communications with Shepard and why he attempted to delete the text messages.

Even assuming their contents were offered for the truth of the matter asserted, *see* TEX. R. EVID. 801(d)(2), we hold the text message statements between Dixon and Shepard were non-hearsay.  TEX. R. EVID. 801(e)(2)(A), (D), (E) (including as non-hearsay opposing party's statements, statements by agent during scope of relationship, and statements by co-conspirator during furtherance of conspiracy).  And for the reasons similar to those explained above, we find no violation of Dixon's rights under the Confrontation Clause because the text messages exchanged between Dixon and Shepard are non-testimonial.

We are also unmoved by Dixon's argument that because some text messages could not be recovered, considerations of "context" required the trial court to exclude the remaining messages.  Dixon attempted to obstruct the police investigation by destroying all text messages with Shepard; his efforts failed for some of the messages.  Dixon's problem is of his own making.  We decline Dixon's invitation to exclude from consideration the messages he unsuccessfully attempted to conceal through his own acts.

Moreover, the probative value of the text message exchange was not substantially outweighed by danger of any of the unfairness factors identified in TEX. R. EVID. 403.  The evidence permitted the jury to test the veracity of Dixon's defense that he had merely agreed for Shepard to install a camera at Sonnier's home that would surreptitiously video

16

Sonnier's alleged unfaithfulness. In other words, it permitted the jury to question that if merely installing a camera was the agreed-upon plan, why would Dixon and Shepard await Sonnier's arrival or Dixon encourage Shepard to be patient in lying in wait for Sonnier?

We hold the district court did not err in admitting the challenged statements. We also conclude beyond a reasonable doubt that in light of all the evidence, any error in admitting the challenged statements did not contribute to Appellant's conviction. *See* TEX. R. APP. P. 44.2(a). We overrule Appellant's issues three through six.

## Admission of Evidence Regarding Statements by Shepard to Haley Shepard (Issues 7-8)

Through his seventh and eighth issues, Appellant argues the trial court abused its discretion in allowing Haley Shepard to opine she did not believe her father was truthful when he testified in the prior trial that Appellant did not pay him to kill Sonnier. Under the circumstances presented here, we find no reversible error in the trial court's admission of this testimony.

Prior to Haley's testimony, Appellant asked Monty Dixon, Dixon's brother, about the truthfulness of what Shepard said in the prior trial:

> Q. And then in this very courtroom [Shepard] told the truth that [Appellant] didn't have anything to do with planning, or paying, or participating in that murder, didn't he?
> A. Yes, sir.

During examination by the State, Monty admitted he had no idea whether Shepard had told the truth during his prior testimony.

17

When Haley took the stand, Appellant pressed onward with his theme that Shepard was truthful when he said he acted alone (or with Reynolds) in killing Sonnier. The following exchange occurred between Appellant's counsel and Haley:

Q. Do you recall your father telling [Shepard's youngest daughter], "I'm going to tell the truth when I testify"?

A. Yes.

Q. And, "That [Appellant] did not pay me to kill Joseph Sonnier"? Do you remember him saying that?

A. I do remember him saying that.

Q. And he said, "I'm going to tell the truth when I testify." You recall him saying that?

A. Yes.

On redirect examination, the State probed Haley about the alleged truthfulness of Shepard's statements:

Q. [Appellant's counsel] asked you about [Shepard] telling the truth, and you sat through his testimony and watched that; is that correct?

A. Yes.

Q. Do you have an opinion whether or not he was being truthful?

[Appellant's counsel]: Your Honor, this is absolutely, positively not permitted under the Rules of Evidence. She is not a truth polygraph detector, and I object to it.

[The Court]: The Court will overrule your objection.

[Appellant's counsel]: So the Court is going to allow her to express an opinion about whether he was telling the truth?

[The Court]: I will.

[Counsel for Appellant]: Okay. Your Honor, we object that that violates our rights under 5th and 14th Amendments to the United States Constitution and 105 of the Code of Criminal Procedure.

[The Court]: That will be noted.

Q. [Prosecutor to Haley]: Do you think he told the truth, Haley?

A. I do not.

In 2015, Rule of Evidence 801's definition of "hearsay" was amended. Hearsay now means a statement that "(1) the declarant does not make while testifying at the *current* trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." TEX. R. EVID. 801(d)(1) (emphasis added to identify 2015 addition to hearsay definition). Shepard's statements to his daughter and testimony at the prior trial both constitute hearsay as defined by Rule of Evidence 801(d), as amended. Once Shepard's hearsay statements were admitted, Rule 806 permitted Shepard's credibility to be attacked by any evidence that would be admissible as if he had personally testified in the current trial. This permitted the State to elicit opinion evidence attacking Shepard's character for untruthfulness, per Rule of Evidence 608(a). *See Urrutia v. State*, 2019 Tex. App. LEXIS 10177, at *9-13 (Tex. App.—El Paso 2019, pet ref'd) (not designated for publication) (applying Rule 806 and finding no error in trial court's admission of testimony that non-testifying defendant had a bad reputation for truthfulness given prior admission of "buyer's guide" containing a hearsay declaration attributable to defendant).

Moreover, even if Haley's opinion about Shepard's truthfulness did not fall within Rule of Evidence 608, the trial court did not err in admitting the testimony because Dixon "opened the door" by eliciting earlier testimony Shepard was telling the truth in the prior trial. Dixon sought to show the jury that Shepard was telling the truth when he said he acted alone in killing Sonnier. That opened the door to the State presenting evidence that Shepard was *not* telling the truth when he made those statements. *See Schutz v. State*, 957 S.W.2d 52, 71 (Tex. Crim. App. 1997) (holding that otherwise inadmissible

19

evidence may be admitted if the party against whom the evidence is admitted opens the door, provided that the party offering the evidence does not "stray beyond the scope of the invitation.").

Because, under these circumstances, the district court did not err in admitting Haley Shepard's opinion testimony about the truthfulness of her father's prior claims that he acted alone in murdering Sonnier, Appellant's seventh and eighth issues are overruled.

**Refusal to Admit Shepard's Recorded Interviews (Issues 9-10)**

Through issues nine and ten, Dixon argues the trial court denied him the opportunity to present a defense when it sustained objections to Dixon's efforts to introduce into evidence two recorded interviews of Shepard. The Court of Criminal Appeals has identified two occasions in which a trial court's error in excluding evidence may violate the constitutional rights of a criminal defendant: (1) when an evidentiary rule categorically and arbitrarily prohibits the defendant from offering relevant evidence that is vital to his defense; or (2) when a trial court erroneously excludes relevant evidence that is a vital portion of the case and the exclusion effectively precludes the defendant from presenting a defense. *Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005). Dixon argues for application of the second category, i.e., that the district court's exclusion of Shepard's recorded interviews unconstitutionally restrained Appellant from presenting the defense that Shepard acted alone. For reasons explained below, we disagree with Appellant's contention that the trial court committed reversible error.

"That [the defendant] was unable to . . . present his case to the extent and in the form he desired is not prejudicial where, as here, he was not prevented from presenting the substance of his defense to the jury." *Potier v. State*, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002) (en banc) (quoting *United States v. Willie*, 941 F.2d 1384, 1398-99 (10th Cir. 1991)). We hold Appellant was not prevented from presenting the substance of his defense to the jury. Dixon testified that Shepard acted alone in killing Sonnier. Shepard, the alleged corroborating witness, was available in the Lubbock County Jail during the entirety of Dixon's trial, but neither side elected to call him to testify. In light of the other available evidence, the district court's exclusion of the recordings did not unconstitutionally preclude Dixon from presenting his defense. *See Ray*, 178 S.W.3d at 836 (holding exclusion of corroborating witness did not unconstitutionally preclude defendant from showing she did not possess drugs when she testified to the same); *Vanwinkle v. State*, No. 02-09-00200-CR, 2010 Tex. App. LEXIS 8686, at *8 (Tex. App.—Fort Worth Oct. 28, 2010, pet ref'd) (mem. op., not designated for publication) (exclusion of evidence that affects the "method" for presenting a defense is not of constitutional dimension when other means of presenting the defense remain available).

We next look to whether any error in excluding Shepard's interview recordings constitute harm, per Appellate Rule 44.2(b). *See* Tex. R. App. P. 44.2(b). In *Ray*, the Court of Criminal Appeals held that although the trial court's erroneous exclusion of third-party witness testimony was not of a constitutional dimension, the error was reversible under the Rules of Appellate Procedure due to the prejudice the ruling caused in preventing the defendant from presenting evidence "which would have corroborated and given independent credibility to the defense she sought to establish." *Ray*, 178 S.W.3d

at 836. Unlike in *Ray*, however, Appellant's complaint is not that Shepard was excluded from testifying. We do not know if Shepard would have testified whether Dixon had any role in Sonnier's murder because he was never called to the stand. Appellant's decision to not elicit testimony from an unpredictable witness may reflect his difficult, albeit not uncommon, trial dilemma, but militates against an argument he was barred from presenting such evidence due to the trial judge's ruling. We, therefore, conclude that, in the context of the entire case against Appellant, any error in excluding Shepard's interview recordings did not have a substantial or injurious effect on the jury's verdict and did not affect Appellant's substantial rights. *McKinney v. State*, 59 S.W.3d 304, 313 (Tex. App.—Fort Worth 2001, pet. ref'd). Appellant's issues nine and ten are overruled.

## Admission of Victim Character Evidence (Issues 21-22)

By issues twenty-one and twenty-two, Appellant argues the trial court abused its discretion by admitting alleged victim character evidence during the guilt/innocence phase of trial.[10] The State offered twelve Sonnier family photographs for admission into evidence. Appellant objected. This colloquy followed:

[Appellant's counsel]: There's 12 pictures that appear to be just simple victim impact evidence, and so we object on that basis. I think we had this same problem last time and you allowed, I believe, one of them in but not all 12, so we object for that reason. It's more prejudicial than it is probative.

[Prosecutor]: The Court also knows where this is going. The Court ultimately allowed all of them in, because what Defense will do is paint Dr.

_____

[10] We hold that Appellant's generic "due process" objection was not specific enough to sufficiently apprise the trial court of a constitutional complaint. *See Hooks v. State*, 144 S.W.3d 652, 654 (Tex. App.— Beaumont 2004, no pet.) (stating "[a]lthough [appellant] tendered a general state and federal due process challenge to the entire sex offender registration statute, the particular provisions of the act that are challenged on appeal were not mentioned in the trial court. Likewise, no specific due process arguments or authorities were presented to the trial court.").

Sonnier as some type of crazed womanizer, some morally bankrupt man, and so we have the right to rebut that charge.

[The Court]: The Court will overrule your objection and admit [the photographs].

[Appellant's counsel]: Make sure we're clear we're objecting this is victim impact testimony and due process clause.

Victim character evidence is generally recognized as "evidence concerning good qualities possessed by the victim." *Mathis v. State*, 67 S.W.3d 918, 928 (Tex. Crim. App. 2002) (citing *Mosley v. State*, 983 S.W.2d 249, 261 (Tex. Crim. App. 1998) (internal quotation marks omitted)). Such evidence is not probative of guilt or innocence and therefore inadmissible "at the guilt-innocence phase of a trial because it does not tend to make more or less probable the existence of any fact of consequence with respect to guilt or innocence." *Love v. State,* 199 S.W.3d 447, 456-57 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Miller-El v. State,* 782 S.W.2d 892, 895 (Tex. Crim. App. 1990)).

Error in the admission or exclusion of evidence under the rules of evidence is generally reviewed for non-constitutional error. *See Walters v. State,* 247 S.W.3d 204, 219 (Tex. Crim. App. 2007) ("The erroneous exclusion of evidence offered under the rules of evidence generally constitutes non-constitutional error."). Under this standard, an appellate court must disregard a non-constitutional error that does not affect a criminal defendant's "substantial rights." TEX. R. APP. P. 44.2(b). An error affects a substantial right of the defendant when the error has a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *Lynch v. State,* No. 01-15-00421-CR, 2016 Tex. App. LEXIS 4755, at *17-19 (Tex. App.—Houston [1st Dist.] May 5, 2016, pet. ref'd) (mem. op., not designated for publication). To

determine if non-constitutional error had a substantial or injurious influence on the jury's verdict, we consider the following:

> [E]verything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case.

*Barshaw v. State*, 342 S.W.3d 91, 94 (Tex. Crim. App. 2011); *Lynch*, 2016 Tex. App. LEXIS 4755 at *15.

After considering the record as a whole consistent with the instruction from the Court of Criminal Appeals, we hold that any error by the district court in admitting Sonnier's photographs into evidence was harmless. The State marshalled a substantial body of evidence over a lengthy trial to prove Appellant's guilt. We affirmed the sufficiency of that evidence to prove Appellant's guilt in our earlier opinion, and that determination was not overturned on further appeal. The State's introduction of the twelve photographs were admitted, in part, to rebut Dixon's introduction of evidence to attack Sonnier's character. While none of this evidence was relevant to determination of Appellant's guilt or innocence, we do not find that introduction of the photographs had a substantial or injurious effect or influence in determining the jury's verdict in light of all the other evidence. *See* TEX. R. APP. P. 44.2(b); *Lynch*, 2016 Tex. App. LEXIS 4755 at *18-19 (holding that trial court's improper admission of victim-character evidence harmless given the other evidence of defendant's guilt). Appellant's twenty-first and twenty-second issues are overruled.

**Part III: Comments During Jury Selection**

## Trial Court Comments During Voir Dire (Issue 18)

In his eighteenth issue, Dixon argues the district court erred by improperly commenting on the weight of the evidence. At a bench conference[11] during jury selection, the attorneys were involved in a discussion regarding venirepersons' answers to questions about whether they would consider probation as punishment if Dixon were convicted of manslaughter. The following exchange occurred:

> [Prosecutor, discussing venireperson]: I mean, he's not challengeable for cause under this fact pattern. This is, again, just another way of trying to get good jurors excused for cause, when the fact pattern is no way in the world supporting manslaughter in this case.
>
> [The Court]: I would agree.
>
> [Appellant's Counsel]: Well, Judge, it was in the jury charge last time.
>
> [The Court]: I know it was in the jury charge. *That doesn't necessarily mean the Court thinks that the jury is going to return a verdict finding the person guilty of that charge based on the Court's recollection of the evidence.*
>
> [Appellant's Counsel]: I understand. That's why we have juries though.
>
> [The Court]: I understand that.
>
> [Appellant's Counsel]: But to be qualified for this jury to be qualified—they have to be qualified to give punishment and consider every—
>
> [The Court]: If they were to find a person guilty of that particular charge.
>
> [Appellant's Counsel]: Exactly.

---

[11] A bench conference has been found to be a hearing outside the presence of the jury, satisfying the requirement of Rule of Evidence 103. *Haley v. State,* 173 S.W.3d 510, 517 (Tex. Crim. App. 2005) (discussing former Rule 103(a)).

[The Court]: And that's where the Court's decision as to whether or not to excuse people for something on a lesser offense that might not necessarily be convicted of but be raised.

[Appellant's Counsel]: I'm just saying, Judge, I'm afraid you're injecting reversible error from the beginning –

(emphasis added).

According to Dixon, the trial court's statement, "That doesn't necessarily mean the Court thinks that the jury is going to return a verdict finding the person guilty of that charge based on the Court's recollection of the evidence," constitutes an improper comment on the weight of the evidence because it predisposed the venire "to reject consideration of lesser punishment and lesser included offenses." We disagree. The record reflects the trial court's comments were made outside the jury's presence. Fundamental to the premise that the trial court erred in making a comment predisposing the jury against the Appellant is the requirement that jurors (or potential jurors) must hear it. Much like the proverbial tree that falls in the woods, a judge's statement cannot be said to unfairly benefit the State or prejudice the jury against the defendant when no juror is around to hear it. Appellant's eighteenth issue is overruled.

**Prosecutor's Statements During Voir Dire (Issues 19-20)**

Through issues nineteen and twenty, Appellant argues the State's attorney unfairly prejudiced the jury when he told the venire during jury selection that he does not try people who are not guilty. The prosecutor stated:

> If I'm going to sit somebody down and accuse them of the most serious crime that the State of Texas has, I dang sure better be able to prove it. If I don't, find him not guilty. I'm not scared of those words, okay? My job—If you go to our office and you look above our reception, in our grand jury room and in my office above my desk is a sign that simply says, "It's the

26

duty of the prosecutor to seek justice." Not to gain convictions, but to seek justice. When it describes my job, it says in this book and all these different colored books that we have, it says my job is to seek justice. Sometimes that's not done. Y'all have heard of Timothy Cole here, right? Okay. Timothy Cole was a guy that was tried and prosecuted when I was in school, and he was convicted of a rape he didn't commit, okay? He's got a statue now that's over—kind of in his honor over there by Texas Tech. Anybody know how Timothy Cole got exonerated?

Appellant's counsel then asked to approach the bench. Before the bench, counsel stated:

> I've heard [the prosecutor] say that he is the one who exonerated Tim Cole on more than one occasion. And because of that I've done a little research and talked to some witnesses, and if he's going to say that again to this jury right now we want to present evidence on that later on because he is making this issue relevant in front of this jury.

An exchange between the attorneys ensued. The trial court then intervened, stating:

> Time out. I'm well aware of who Mr. Cole is and all that. I don't have a problem y'all talking about it, but leave it at DNA testing being done and that will be the end of it.

The prosecutor responded, "All right," and the State resumed its voir dire, picking up with the following: "We were talking about the exoneration of Timothy Cole, and it was done because DNA was requested by our office to show that he didn't commit that crime, okay? That's justice in that case." Appellant's counsel made no objection to the prosecutor's remarks, but further discussed Cole's conviction and exoneration to illustrate to the venire why innocent people sometimes go to prison.

When a prosecutor injects personal opinion in statements to a jury, such a statement "encourages jurors to conclude that a defendant is 'necessarily guilty because he was being tried.'" *Escobar v. State*, No. 01-13-00496-CR, 2015 Tex. App. LEXIS 3624,

27

at *3 (Tex. App.—Houston [1st Dist.] Apr. 14, 2015 pet. ref'd) (mem. op., not designated for publication) (quoting *Mendoza v. State*, 552 S.W.2d 444, 447 (Tex. Crim. App. 1977)). It is unnecessary to take a position on whether the prosecutor's remarks were improper because the error was not preserved for appellate review. As noted earlier in this opinion, Appellate Rule 33.1 ordinarily requires a party to make a specific, timely objection before it can preserve an alleged error for appellate review. TEX. R. APP. P. 33.1(a). Dixon's attorney lodged no objection, but indicated a desire to present additional evidence to challenge the prosecutor's statement that Cole's exoneration was the result of the State's efforts.

In apparent recognition of his failure to preserve error, Appellant now attempts to invoke the "plain error" doctrine that is referenced in Federal Rule of Criminal Procedure 52(b). Texas does not have a procedural rule that is a direct counterpart to Rule 52(b),[12] although Rule of Evidence 103(e) permits a court to "take notice of a fundamental error affecting a substantial right, even if the claim of error was not properly preserved." TEX. R. EVID. 103(e). In *Marin v. State*,[13] the Court of Criminal Appeals categorized a litigant's rights in three groups: (1) systemic rights: "absolute requirements and prohibitions;"[14] (2) waivable rights: "rights of litigants which must be implemented by the system unless

---

[12] *See Thomas v. State,* No. 08-14-00095-CR, 2015 Tex. App. LEXIS 11311, at *9 n.1 (Tex. App.—El Paso Nov. 3, 2015, pet ref'd) (not designated for publication).

[13] 851 S.W.2d 275, 279 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State,* 947 S.W.2d 262 (Tex. Crim. App. 1997).

[14] These are rights "which are essentially independent of the litigants' wishes. Implementation of these requirements is not optional and cannot, therefore, be waived or forfeited by the parties." *Sanchez v. State,* 120 S.W.3d 359, 366 (Tex. Crim. App. 2003) (citing *Marin,* 851 S.W.2d at 279.)

expressly waived;"[15] and (3) forfeitable rights: "rights of litigants which are to be implemented upon request."[16]  *Id.* at 279.  For purposes of Dixon's argument on appeal, we will assume Appellant's "plain error" argument intends to claim the prosecutor's statements about Timothy Cole violate the first or second *Marin* categories and may be raised for the first time on appeal.  *See Proenza v. State,* 541 S.W.3d 786, 795 (Tex. Crim. App. 2017) (identifying "fundamental error" described in Rule 103(e) as the first two categories of rights in *Marin*).

After a careful review of the prosecutor's statements in the context of the entire record, we hold that assuming such statements were improper, they did not prejudice Dixon via "fundamental error."  The record indicates the statements occurred alongside significant discussion by the prosecutor regarding the presumption of innocence and the State's burden of proof, undermining a finding of fundamental error.  *Escobar,* 2015 Tex. App. LEXIS 3624, at *10.  Any harm in the prosecutor's references to Timothy Cole was further mitigated once Appellant's counsel also referred to Cole as a warning of how innocent people can be convicted.  "Fundamental error must be so egregious it prevents a fair and impartial trial."  *Escobar*, 2015 Tex. App. LEXIS 3624, at *4 (quoting *Beltran v. State*, 99 S.W.3d 807, 811 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd)).  Mr. Cole

---

[15] These are rights that cannot be forfeited.  "That is to say, they are not extinguished by inaction alone.  Instead, if a defendant wants to relinquish one or more of them, he must do so expressly."  *Sanchez,* 120 S.W.3d at 366 (citing *Marin,* 851 S.W.2d at 278-79).

[16] A party must "insist upon [the implementation of these rights] by objection, request, motion, or some other behavior calculated to exercise the right in a manner comprehensible to the system's impartial representative, usually the trial judge . . . .  The trial judge as an institutional representative has no duty to enforce forfeitable rights unless requested to do so."  *Sanchez,* 120 S.W.3d at 366 (citing *Marin,* 851 S.W.2d at 279-80).  "[W]hen a defendant fails to assert his forfeitable rights at trial, no error attends failure to enforce them and none is presented for review on appeal."  *Id.* (citing *Marin,* 851 S.W.2d at 280) (internal quotation marks omitted).

was used as an example by both sides and in support of their perspectives about the burden of proof. In light of the entire record, the prosecutor's statements did not constitute fundamental error because they neither bore on the presumption of innocence nor vitiated the impartiality of the jury.

Because we find no fundamental error arising from the prosecutor's statements, Dixon was required to interject a timely, specific objection to such statements in order to preserve his complaint for appellate review. Dixon failed to do so, so his nineteenth and twentieth issues are overruled.

**Part IV: Challenges for Cause**

Through his twenty-fourth and twenty-fifth issues, Appellant argues the trial court erred by refusing to strike for cause venirepersons who indicated they could not consider probation as punishment for conviction of the lesser-included offense of manslaughter and he was therefore harmed because the jury selected included those who would not follow the law. Appellant also injects into his consolidated argument of these two issues complaints that the trial court reversibly erred by denying other defense challenges for cause and for refusing to grant additional peremptory challenges.

"Both the State and defense are entitled to jurors who can consider the entire range of punishment for the particular statutory offense—*i.e.*, from the maximum to the minimum and all points in between." *Cardenas v. State,* 325 S.W.3d 179, 184 (Tex. Crim. App. 2010). "Jurors must be able to consider both 'a situation in which the minimum penalty would be appropriate and . . . a situation in which the maximum penalty would be appropriate.'" *Id.* (quoting *Fuller v. State,* 829 S.W.2d 191, 200 (Tex. Crim. App. 1992)).

30

"Therefore, both sides may question the panel on the range of punishment and may commit jurors to consider the entire range of punishment for the statutory offense." *Id.* (internal footnotes omitted). *Id.*

In the present case, the jury convicted Appellant of capital murder. Because his life sentence without the possibility of parole was mandated by statute, *see* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1, the jury was not asked to consider Appellant's punishment. The Court of Criminal Appeals has previously held any error by a trial court's refusal to grant a defendant's for-cause challenges would be harmless when the punishment range of a lesser-included offense was never considered due to the defendant's conviction for capital murder. *King v. State,* 953 S.W.2d 266, 268 (Tex. Crim. App. 1997). We similarly conclude that despite Appellant's complaint about the trial court's refusal to strike potential jurors who refused to consider probation as punishment for the offense of manslaughter, any error was harmless when Appellant was convicted of capital murder.

Appellant appends to the argument a complaint that he was forced to peremptorily challenge seven venirepersons (numbers 1, 6, 7, 24, 39, 50, and 54) who should otherwise have been stricken for cause. Appellant's request of the trial court for additional peremptory challenges "to try to cure this error" was denied. Preservation of error when a challenge for cause is denied requires an appellant demonstrate on the record that: "1) he asserted a clear and specific challenge for cause; 2) he used a peremptory challenge on the complained-of venireperson; 3) all his peremptory challenges were exhausted; 4) his request for additional strikes was denied; and 5) an objectionable juror sat on the jury." *Feldman v. State,* 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). The requirement of a

"clear and specific challenge for cause" ensures the defendant alerts the trial court of his complaint at a time when the court has an opportunity to respond and cure the complaint. *Comeaux v. State,* 445 S.W.3d 745, 749 (Tex. Crim. App. 2014) (citing *Loredo v. State,* 159 S.W.3d 920, 923 (Tex. Crim. App. 2004)).

Appellant argues Venireperson number 1 should have been stricken for cause because she could not judge people, and that Venireperson number 39 should have been stricken because she was a victim and could not be fair. We are not directed to, nor do we find, a location in the record where Appellant asserted a clear and specific challenge for cause of Venirepersons number 1 or 39. We hold error was not preserved for review. *See* TEX. R. APP. P. 33.1(a).

Appellant next asserts Venireperson number 6 should have been stricken for cause because she would credit law enforcement over other testimony, and that Venireperson number 50 should have been stricken due to friendship with two testifying police officers. For preservation of these claimed errors, Appellant cites only to juror questionnaires contained in a sealed supplemental clerk's record. There is no indication the trial court was made aware of the complaints Appellant now makes. Appellant's complaints on appeal regarding Venirepersons number 6 and 50 were not preserved for review. *See* TEX. R. APP. P. 33.1(a).

Appellant argues Venireperson number 24 should have been stricken for cause because she could not give her attention to the evidence if selected. Yet, in the portion of the record to which Appellant cites, Venireperson number 24 agrees with defense counsel that if selected she will give the evidence her "full, undivided attention." We have

32

no indication Venireperson 24 was challenged for cause on the basis of an asserted inability to give attention to the evidence. Accordingly, this complaint is not preserved for appellate review. *See* TEX. R. APP. P. 33.1(a). If this is the intended basis for a challenge for cause which was denied, we hold that no abuse of discretion has been shown.

Appellant complains that Venireperson number 54 should have been stricken for cause because, on a second juror questionnaire, she checked a response agreeing that Appellant "might possibly be guilty." When questioned by the trial court, Venireperson number 54 acknowledged there was no reason she could not be a fair and impartial juror. Appellant's for-cause challenge to Venireperson number 54 was not based on the ground of her answer to the second juror questionnaire, but because she allegedly indicated a bias in favor of law enforcement witnesses. We hold the complaint raised in this issue was not preserved. *See* TEX. R. APP. P. 33.1(a); *Clark v. State,* 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (issues raised on appeal must comport with objections made at trial).

Finally, regarding Venireperson number 7, Dixon argues she should have discharged without further inquiry from either party or the court because she allegedly expressed in her questionnaire an opinion about Appellant's guilt or innocence based on what she had heard or read about the case. During jury selection, Venireperson number 7 denied she was still of this opinion; she promised that, if selected, she would set aside anything she had heard or read about the case and decide the case based only on the evidence. Venireperson number 7 indicated her earlier opinion had been based on hearsay from the media, but she had since learned of the importance of evidence.

Texas Code of Criminal Procedure Article 35.16(a) provides in part that a "challenge for cause may be made by either the state or the defense for any one of the following reasons":

> That from hearsay or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence the juror in finding a verdict. To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in the juror's opinion, the conclusion so established will influence the juror's verdict. If the juror answers in the affirmative, the juror shall be discharged without further interrogation by either party or the court. If the juror answers in the negative, the juror shall be further examined as to how the juror's conclusion was formed, and the extent to which it will affect the juror's action; and, *if it appears to have been formed from reading newspaper accounts, communications, statements or reports or mere rumor or hearsay, and if the juror states that the juror feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that the juror is impartial and will render such verdict, may, in its discretion, admit the juror as competent to serve in such case.* If the court, in its discretion, is not satisfied that the juror is impartial, the juror shall be discharged[.]

TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(10) (emphasis supplied).

Venireperson number 7 made clear her questionnaire opinion would not influence her verdict because it was formed from media reports, and that she had since learned of the centrality of evidence in a trial and would make her decision only on the evidence received. We conclude the trial court did not abuse its discretion by denying Appellant's challenge for cause of Venireperson number 7.

Having found no error by the trial court in failing to strike for cause the seven venirepersons made the subject of Appellant's complaint in issues twenty-four and twenty-five, we also conclude the trial court did not err in refusing to grant Appellant six

34

additional peremptory challenges corresponding to venirepersons numbers 1, 6, 7, 39, 50, and 54 "to try to cure [the] error" of not striking these venirepersons for cause. Appellant's twenty-fourth and twenty-fifth issues are overruled.

### Part V: Search Warrants

For Appellant's issues twenty-six through thirty-four, we examine the propriety of the district court's denial of Dixon's attempt to suppress evidence seized by law enforcement at his residence, medical office, and PASI. We review a trial court's ruling on a motion to suppress for abuse of discretion, using a bifurcated standard. *Guzman v. State,* 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). Generally, with respect to a suppression ruling, the trial court's findings of historical fact supported by the record, as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor, are given "almost total deference[.]" *Id.* at 89. *See also Dunn v. State,* 478 S.W.3d 736, 742 (Tex. App.—Fort Worth 2015, pet. ref'd). A de novo standard is applied to a trial court's determination of the law and its application of law to the facts when such application does not turn on an evaluation of credibility and demeanor. *Id.* We will uphold a trial court's ruling on a motion to suppress if the ruling is reasonably supported by the record and correct under any theory of law applicable to the case. *State v. Dixon,* 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

Texas law requires that no search warrant issue without an affidavit stating facts establishing probable cause. *See* TEX. CODE CRIM. PROC. ANN. art. 18.01(b), (c). In other words, a magistrate "may not issue a search warrant without first finding 'probable cause' that a particular item will be found in a particular location." *State v. Duarte,* 389 S.W.3d

349, 354 (Tex. Crim. App. 2012) (citation omitted). In our evaluation of a probable cause affidavit, we consider "whether a reasonable reading by the magistrate would lead to the conclusion that the four corners of the affidavit provide a 'substantial basis' for issuing the warrant." *Id.* at 354. Probable cause exists when, "under the totality of the circumstances, there is a 'fair probability' that contraband or evidence of a crime will be found at the specified location. This is a flexible, nondemanding standard." *Id.* (citations omitted).

We review the supporting affidavit "realistically, and with common sense," focusing on the combined logical force of the facts stated in the affidavit rather than on facts that are not stated. *Duarte,* 389 S.W.3d at 354 (citing *Rodriguez v. State,* 232 S.W.3d 55, 61 (Tex. Crim. App. 2007)). "When in doubt, we defer to all reasonable inferences that the magistrate could have made." *Rodriguez,* 232 S.W.3d at 61.

**Affidavit Supporting Search Warrant for Appellant's Medical Office (Issues 26-28)**

Through issues twenty-six, twenty-seven, and twenty-eight, Appellant argues the affidavit submitted by Detective Johnson was insufficient to establish probable cause for the search of Appellant's medical office. Johnson stated in his affidavit that as a part of his employment by the Lubbock Police Department in the person crimes section, he was investigating the murder of Sonnier. Johnson stated his basis for connections between Sonnier and Dixon, included that both men had dated Shetina. During Johnson's interview with Paul Reynolds, Johnson learned Shepard told Reynolds he had, among other things, (1) admitted to killing Sonnier; (2) was in business with Dixon; (3) communicated with Dixon via electronic text message while surveilling Sonnier; (4) been paid by Dixon with three bars of silver in exchange for killing Sonnier; and (5) used Dixon's

36

handgun to shoot Sonnier. Johnson also provided information gleaned from his interview with Reynolds and a meeting with Vicky Wheeler that Dixon, a medical doctor, stitched Shepard's wrists at his medical office after Shepard unsuccessfully attempted suicide in the days following Sonnier's murder.

Johnson expressed the opinion that Appellant's medical office contained electronic devices (including cell phones, computers and various storage devices) and other documentation relevant to the charged offense. Johnson noted he found it unusual that when a search was conducted at Dixon's residence, no computers were found. He reasoned that "it is a known possibility" that Dixon would have the computers and electronic devices at his medical office.

Appellant complains Johnson's affidavit is insufficient because it only points to where the items sought are not (i.e., because evidence of the crime was not at Dixon's residence, it must be at his office). But we note that the magistrate was not required to hypertechnically analyze Johnson's affidavit. Rather, applying a reasonable, commonsense interpretation and drawing from its facts all reasonable inferences, the magistrate could determine from the affidavit that Appellant and Shepard were in business together; that Appellant agreed to pay Shepard three bars of silver for the murder of Sonnier; that Appellant provided a gun for Shepard; and that Shepard and Appellant communicated via electronic messaging while Shepard watched for Sonnier to arrive at home. The affidavit also permitted the magistrate to determine that four days after Shepard killed Sonnier, after normal business hours, Appellant and Shepard were seen together at Appellant's medical office for Appellant to stitch Shepard's cuts.

The affidavit permits the reasonable inference that Dixon must possess and use some device capable of transmitting electronic messages with Shepard. In 2012, medical offices contained computers and data storage devices; a surgeon in Dixon's position possesses some degree of computer literacy. Therefore, the magistrate was permitted to properly find there existed a fair probability or substantial chance that Appellant's medical office contained computers, mobile phones, and/or data storage devices possessing data and information about Sonnier's murder. If not in electronic form, tangible records relevant to the gun Appellant provided Shepard and payment for murder with silver bars also were contained inside Appellant's medical office. Applying a high degree of deference to the magistrate's determination, as we must, we find that Johnson's affidavit concerning the requested search of Appellant's medical office presented a substantial basis for the magistrate's probable cause determination. Appellant's issues twenty-six, twenty-seven, and twenty-eight are overruled.

**Affidavit Supporting Search Warrant for Appellant's Residence (Issues 29-31)**

By issues twenty-nine, thirty, and thirty-one, Appellant argues the affidavit submitted by Detective Pena was insufficient to establish probable cause for the search of Appellant's residence. According to Pena's affidavit, she was employed by the Lubbock Police Department in the person crimes section, and investigating Sonnier's murder. She stated the opinion that Appellant possessed and was concealing at his residence a gun, ammunition, at least one knife possibly containing DNA evidence, computers and storage devices, clothing possibly containing blood and DNA evidence, cellular telephones, cameras, and paper documentation relevant to the murder of Sonnier.

Pena's affidavit contains statements of fact and opinion substantially similar to the previously-noted averments of Johnson. Pena added to the information Shepard had disclosed to Reynolds that Shepard sent Appellant several text messages while watching Sonnier "right before" Shepard killed Sonnier. We find that Pena's affidavit concerning the requested search of Appellant's residence presented a substantial basis for the magistrate's probable cause determination. Appellant's issues twenty-nine, thirty, and thirty-one are overruled.

**Affidavit Supporting Search Warrant for PASI (Issues 32-34)**

Through issues thirty-two, thirty-three, and thirty-four, Appellant complains the affidavit supporting the warrant for searching the office of PASI, "does not contain facts sufficient to justify a conclusion that the objects of the search are probably on the premises to be searched at the time the warrant issued." The State responds that the claimed error was not preserved by pretrial motion to suppress or trial objection and was therefore forfeited.

In the trial court, Appellant requested a *Franks*[17] hearing to argue the affidavits supporting the search warrants issued contained materially-false information and omitted material information in reckless disregard of the truth. Assuming for this discussion that Appellant's motion for a *Franks* hearing sufficiently included a challenge of Johnson's affidavit pertaining to the search warrant for PASI, Appellant nevertheless failed to challenge the affidavit via the factual-insufficiency ground urged on appeal. A complaint on appeal must align with the complaint made in the trial court. *See Thomas v. State,*

---

[17] *Franks v. Delaware,* 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

723 S.W.2d 696, 700 (Tex. Crim. App. 1986) ("[I]f an objection made in the trial court differs from the complaint made on appeal, a defendant has not preserved any error for review"). Appellant's issues thirty-two, thirty-three, and thirty-four are overruled.

**Sufficiency of Search Warrant for Appellant's Medical Office (Issues 35-37)**

Through issues thirty-five, thirty-six, and thirty-seven, Appellant argues the trial court erred by failing to suppress the items seized during the search of his medical office because the search was accomplished under an unlawful general warrant. The State responds that of all the items seized from Appellant's medical office only an Apple laptop computer and router were received into evidence. The State also argues that Appellant's complaint was not preserved for appeal. We agree with the State.

"Because indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment, that Amendment requires that the scope of every authorized search be particularly described." *Walter v. United States,* 447 U.S. 649, 657, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980) (internal quotation marks and citation omitted). "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States,* 275 U.S. 192, 196, 48 S. Ct. 74, 72 L. Ed. 231 (1927).

40

While the Fourth Amendment prohibits warrants allowing "general, exploratory rummaging in a person's belongings"[18] the accused is not relieved of the obligation to challenge an alleged general warrant via timely, specific objection. TEX. R. APP. P. 33.1(a). Issues on appeal must correspond or comport with objections and arguments made at trial. *Wright v. State,* 154 S.W.3d 235, 241 (Tex. App.—Texarkana 2005, pet. ref'd) (citing *Dixon v. State,* 2 S.W.3d 263, 273 (Tex. Crim. App. 1998)). When "a trial objection does not comport with the issue raised on appeal, the Appellant has preserved nothing for review." *Id.*; *see* TEX. R. APP. P. 33.1(a).

Appellant directs us to five locations in the record which he contends demonstrate the matter was sufficiently brought to the trial court's attention: three suppression motions, a brief, and the tenor of cross-examination questions posed of Johnson at the suppression hearing.[19] However, after a careful review of Appellant's arguments alongside the record, we find no instance in which Dixon urged the general-warrants argument he now makes on appeal. Appellant's issues thirty-five, thirty-six, and thirty-seven are overruled.

---

[18] *Walthall v. State,* 594 S.W.2d 74, 78 (Tex. Crim. App. 1980) (cleaned up).

[19] Appellant's motions and brief discussed the following:

- Via his first and second motions to suppress, Appellant argued the relief he sought was warranted because "evidence seized and obtained was the result of a search of the [Appellant's] property or places where he had an expectation of privacy without a valid search warrant and without probable cause . . . ."

- In a supplemental motion to suppress, Appellant "object[ed] to the illegal search of his office."

- In a reply brief concerning his requested suppression of items seized from Appellant's medical office, he complained, "The affiants gave the magistrate zero information to conclude [Appellant] owned a computer or that any evidence at all would be found on it."

## Alleged Materially False Statements and Omissions in the Probable Cause Affidavits (Issues 38-39)

Through issues thirty-eight and thirty-nine, Appellant argues the affidavits offered in support of a warrant to search his residence, white mobile phone, and offices contain materially-false statements and material omissions, and that probable cause was accordingly dissipated.[20]  An affidavit supporting a search warrant is presumed to be truthful.  *Franks,* 438 U.S. at 171.  But this presumption may be rebutted, and a *Franks* hearing is ordered, when "a defendant [] makes a substantial preliminary showing that a false statement was made in a warrant affidavit knowingly and intentionally, or with reckless disregard for the truth . . . ."  *Harris v. State,* 227 S.W.3d 83, 85 (Tex. Crim. App. 2007).

When at a *Franks* hearing the defendant proves by a preponderance of the evidence perjury or reckless disregard for the truth, the affidavit's false material is set aside, and the remaining content of the affidavit is tested for the existence of sufficient probable cause.  *Harris,* 227 S.W.3d at 85.  In the context of a *Franks* analysis, truthful "does not mean letter-perfect, but rather that the information put forth in the affidavit is believed or appropriately accepted by the affiant as true."  *Clement v. State,* 64 S.W.3d 588, 592 (Tex. App.—Texarkana 2001, pet ref'd) (citing *Franks,* 438 U.S. at 164-65).

---

[20] Johnson signed the affidavit requesting a warrant to search Appellant's mobile phone and flash drive, the PASI office, and Appellant's medical office.  Pena signed the affidavit supporting the request for a warrant to search Appellant's residence.  The affidavits contain essentially identical allegations of fact relevant to issues thirty-eight and thirty-nine.

Appellant alleged to the district court that the detectives' affidavits contained materially-false statements and material omissions in a number of ways, as summarized below:

- They falsely alleged Appellant's mobile phone and a flash drive were reported as seized from him during his arrest;

- They materially omitted the fact that when Shepard told Reynolds he killed Sonnier, (a) Shepard was "delusional and 'all spaced out;'" (b) Shepard admitted killing his own mother and being insane; (c) Shepard had offered to kill Reynolds's brother; and (d) Reynolds did not believe portions of Shepard's story;

- They materially omitted the fact that an employee of Sonnier told police the "last known incident" between Shetina and Appellant was five months prior to Sonnier's murder;

- They materially omitted the fact that Shepard killed a homeless man in New York, saw himself as Appellant's "avenger," and had a "hit list" numbering 40-50 people;

- They materially omitted the fact that Shetina was "untruthful and deceptive" with police.

Appellant's reply brief also refers to a ninety-seven-page block of testimony from the June 16, 2014, suppression hearing as a location where "falsehoods and omissions" were presented to the trial court. Without specific references to the record, we decline Appellant's invitation to parse the pages in search of other omissions or falsehoods. For purposes of assessing Appellant's *Franks* arguments on appeal, we restrict our review to the bulleted list, above. TEX. R. APP. P. 33.1(a).

(1) Mobile Phone and Flash Drive

Appellant argues his mobile phone and flash drive were not on his person when he was arrested and were seized and searched before a warrant issued. His *Franks*

43

contention appears to be that these devices were seized from his home without a warrant, but that Johnson falsely stated in his affidavit that the items were taken from Appellant's person at the time of arrest by Randall County sheriff's deputies. Considering the deferential standard afforded to the court in assessing the evidence, we hold the testimony and other evidence does not affirmatively show that Johnson intentionally and falsely swore that Appellant's mobile phone and flash drive were seized from Appellant's person at the time of his arrest by Randall County deputies.

Former Randall County deputy sheriff Bret Harbert testified at trial that during the early morning hours of July 16, 2012, he executed a warrant for Dixon's arrest at his residence. Harbert testified he could not remember if Appellant had a mobile phone or flash drive on his person at the time of the arrest. Johnson's testimony at the suppression hearing was also unclear: when shown a video of Dixon in the interview room, Johnson said dark images on a table might be a mobile phone and flash drive, but could not be sure unless the picture was enlarged or clarified. Johnson also acknowledged the possibility that the items were removed prior to the interview. Johnson testified he believed the arresting officer had told him Appellant possessed an iPhone at the time of arrest. In addition, Lubbock Police Department officer Christopher Powe testified he understood Appellant's iPhone and flash drive were seized from Dixon by arresting officers at the time of arrest.

The conflicting state of the evidence permits the district court's reasonable determination that Johnson did not materially or falsely aver in his affidavit that Dixon's iPhone or flash drive were seized from his person at the time of his arrest.

44

## (2) Statements Regarding Shepard's Other Conduct

Appellant urges Detectives Johnson and Pena omitted numerous material facts about Shepard from the probable cause affidavits and with reckless disregard for the truth. When asked about why he omitted reference to certain facts from his affidavit—such as Shepard's alleged murder of his mother and a homeless man, an offer to kill Reynold's brother, and a hit list—Johnson replied that such information was not probative and evidentiary to the purpose of the affidavit. He explained he includes in his affidavits "information that corroborates a crime scene, and an offense that has occurred." The omitted allegations pertain to Shepard's character.

It remains to be seen how such omissions are material given the other conduct contained in the affidavit that impugns Shepard's character. Those stated actions—that Dixon does not contest—show that Shepard: (1) killed Sonnier in exchange for three bars of silver; (2) surveilled Sonnier for several weeks before the murder; (3) entered Sonnier's home by coming through a window; (4) both shot and stabbed Sonnier numerous times; (5) made efforts to muzzle the gunshots; and (6) twice attempted suicide following his murder of Sonnier. The omitted facts were not inconsistent with the bizarre, heinous nature of the murder the affiants did describe. To the extent Reynolds had doubts about the accuracy of Shepard's statements, many were countered by evidence found at the murder scene but not revealed to the public.

(3) Statements Regarding End of Shetina's Relationship with Dixon

Dixon also complains the detectives materially omitted a portion of a statement attributed to Marylu Mendez, a co-worker of Sonnier's. Johnson's affidavit reports Sonnier allegedly told Mendez that "[Shetina's] ex-boyfriend would not leave her alone." Appellant argued in his *Franks* motion the affidavit omits that Mendez also said, "the last known incident" between Shetina and Appellant occurred five months before the murder.

However, nothing in Mendez's statement actually indicates what Dixon alleges. The exact words in Mendez's written statement read, "Doctor Sonnier told me [Shetina's] ex-boyfriend, the doctor, would not leave her alone. Doctor Sonnier told me [Shetina] received a phone call from her ex-boyfriend approximately 5 months ago." Mendez does not aver that the phone call was the last contact or "incident" between Appellant and Shetina. The record before us fails to demonstrate the omission of material statements by Mendez or was done for the purpose of knowingly and intentionally, or with reckless disregard for the truth, misleading the magistrate.

(4) Statements Regarding Shetina

Concerning Shetina, the affiants stated Shetina told them Appellant "insisted on still seeing her, even though she was dating" Sonnier. Appellant argues the affiants materially omitted information that Shetina was "deceptive and untruthful with investigators in regards to her phone contact with the victim and her whereabouts on the day of the [h]omicide." This language originates in an assistant district attorney's application requesting the trial court order that a mobile telephone service provider produce records specific to a stated telephone number. The application does not mention

46

Shetina by name. Even if we assume the requested telephone records concerned Shetina and that she was "deceptive and untruthful with investigators" about her telephone contacts with Sonnier and location on the day of his murder, and that this impeached the credibility of her statement that Appellant insisted on seeing her, we remain faced with two other statements: (1) Appellant would not leave Shetina alone and (2) Shepard killed Sonnier because of a triangle between a "girlfriend that [Sonnier] and [Appellant] had in common." We conclude the force of the affidavits would not have been diminished had the omitted language from the assistant district attorney's application been included.

Assuming but without deciding that Appellant made the required substantial preliminary showing for any of these alleged misstatements or omissions, we conclude Appellant failed to prove by a preponderance of the evidence the affiants made false statements deliberately or with a reckless disregard for the truth, or that they omitted material facts with the same degree of culpability. Moreover, we do not find that the affidavits would be devoid of sufficient probable cause even if the cited portions of the affidavits were set aside. Appellant's issues thirty-eight and thirty-nine are overruled.

**Execution of Search Warrant for Appellant's Residence (Issues 40-42)**

Through his fortieth through forty-second issues, Appellant argues the officers who searched his residence exceeded the scope of the "mere evidence" warrant by seizing items not specified by the magistrate. Chapter 18 of the Texas Code of Criminal Procedure governs search warrants. *See Jennings v. State,* 531 S.W.3d 889, 893 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Property capable of seizure under article

47

18.02(a)(10) is often referred to as "mere evidence." *Id.* (citation omitted); TEX. CODE CRIM. PROC. ANN. art 18.02(10) (a warrant may issue to search and seize "property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense[.]"). Mere evidence is evidence linked to a crime, but does not consist of fruits, instrumentalities, or contraband. *Jennings,* 531 S.W.3d at 893 n.1.

A mere evidence warrant was issued in the present case. It directed officers to search Appellant's residence for, and if found, seize the following items:

> A .25 caliber handgun and associated ammunition, a knife or knives possibly containing blood and DNA evidence, computers, removable disc drives, hard drives, and other computer data devices containing information of the murder for hire plot involving the victim, Joseph Sonnier III, MD, clothing possibly containing blood and DNA evidence, cellular telephone(s) containing evidence of the surveillance and murder for hire plot . . . and camera(s) containing evidence of the surveillance and murder for hire plot . . . camera(s) containing evidence of surveillance and . . . receipts, documentation, pawn tickets and any other paper documentation that evidences the murder for hire plot . . . .

(ellipses added). Following the warrant's execution, Johnson signed a return listing the following ten items as having been seized:

- Two birthday cards;

- SD Card;

- United States Currency totaling $1800;

- Sony iPhone with charger

- Five smoked cigars from the patio of the residence;

- Land title;

48

- Video tape;

- Certificate for Ancillary Services business;

- Black bag containing adult sexual activity items; and

- Garage door opener.

The currency, iPhone and charger, and PASI certificate were sufficiently specified by the warrant. The smoked cigars were not. They were tested for DNA and the results, showing Shepard and Appellant had each smoked a cigar at Appellant's residence, were presented to the jury. Assuming it was error for the trial court not to suppress evidence of the five smoked cigars, the likelihood that the error was a contributing factor in the jury's deliberations in arriving at its verdict is *de minimis*. *Scott v. State,* 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). The fact that Shepard and Appellant had been together at Appellant's residence was not disputed at trial. Appellant told officers he had given Shepard some cigars. We find beyond a reasonable doubt that any error in presenting this evidence to the jury did not contribute to Dixon's conviction or punishment." TEX. R. APP. P. 44.2(a).[21]

We next address the remaining items that were seized: two birthday cards; a document of title to land, a video tape, a black bag containing adult sexual activity items, and a garage door opener. None of these items were admitted into evidence. Beyond a reasonable doubt any error by the trial court in failing to suppress these items was, therefore, harmless. Appellant's issues forty, forty-one, and forty-two are overruled.

---

[21] The erroneous admission of evidence obtained in violation of the Fourth Amendment is constitutional error analyzed under Texas Rule of Appellate Procedure 44.2(a). *Ayala v. State,* No. 03-14-00320-CR, 2016 Tex. App. LEXIS 3545, at \*31 (Tex. App.—Austin Apr. 7, 2016, pet. ref'd) (mem. op., not designated for publication) (citing *Long v. State,* 203 S.W.3d 352, 353 (Tex. Crim. App. 2006)).

**Part VI: Remaining Issues**

**Charge Error (Issue 23)**

Via his twenty-third issue, Appellant complains the application paragraph concerning Count 2 of the indictment did not authorize a conviction for capital murder because it failed to charge Appellant with intending the death of Sonnier. We have sustained Appellant's double-jeopardy complaint under issue seventeen and render a judgment of acquittal for the offense charged under Count 2 of the indictment. As any alleged error in submission of the trial court's charge pertaining to Count 2 is not relevant to Appellant's conviction under Count 1, Appellant's twenty-third issue is overruled.

**Findings of Fact and Conclusions of Law (failure to suppress historical cell site data) (Issue 48)**

By his forty-eighth issue, Appellant asserts the trial court erred by failing to file requested findings of fact and conclusions of law pertaining to its denial of his motion to suppress historical cell site data. The trial court prepared and filed the requested findings and conclusions in 2017 in response to our order of abatement and remand. *See Dixon v. State,* No. 07-16-00058-CR, 2017 Tex. App. LEXIS 2096 (Tex. App.—Amarillo Mar. 10, 2017, per curiam order) (not designated for publication). Appellant's forty-eighth issue is dismissed as moot.

**Cumulative Error (Issues 49-50)**

By his forty-ninth and fiftieth issues, Appellant argues the cumulative effect of the trial court's errors denied him due process of law. Error may accumulate to such a level that the accused is denied a fair trial. *Tello v. State,* No. 07-08-00314-CR, 2009 Tex.

App. LEXIS 8401, at *18-19 (Tex. App.—Amarillo Oct. 30, 2009, no pet.) (mem. op., not designated for publication). However, reversal of the conviction is not warranted unless the combined force of the errors undermined the fundamental fairness of the trial. *Estrada v. State,* 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) (citing *United States v. Bell,* 367 F.3d 452, 471 (5th Cir. 2004)); *cf. United States v. Wood,* 207 F.3d 1222, 1237 (10th Cir. 2000) ("A cumulative error analysis aggregates all the errors that individually might be harmless, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.") (internal quotation marks and citation omitted).

When we conduct a cumulative error analysis, we consider only errors that were preserved for appeal. *See Taylor v. State,* No. 05-14-00821-CR, 2016 Tex. App. LEXIS 13705, at *25 (Tex. App.—Dallas Dec. 27, 2016, pet. ref'd) (mem. op., not designated for publication). We do not consider complained-of errors that were not actually errors. *Chamberlain v. State,* 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error."); *Schmidt v. State,* 612 S.W.3d 359, 372-73 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) (finding no cumulative error because the complaints were either not error or not preserved).

In the present matter, the jury heard more than sixteen days of testimony from sixty witnesses; some 1,800 exhibits were admitted. Dixon testified at trial where he admitted to his knowledge and agreement with Shepard's whereabouts on the evening of Sonnier's murder, but offered an alternative theory about what his arrangement with Shepard was

51

intended to cover. The collective force of any error this record demonstrates[22] is not "logarithmic," that is, "producing a total impact greater than the arithmetic sum of its constituent parts." *United States v. Sepulveda,* 15 F.3d 1161, 1196 (1st Cir. 1993). The Constitution requires a criminal defendant receive a fair trial but not a mistake-free trial. *Id.* (citing *Van Arsdall,* 475 U.S. at 681); *Brown v. State,* 978 S.W.2d 708, 716 (Tex. App.—Amarillo 1998, pet. ref'd) ("Appellant is not entitled to a perfect trial, but he is entitled to at least one tolerably fair.") (internal quotation marks, bracketing, and citations omitted). Based on the record before us, we conclude beyond a reasonable doubt that the trial Appellant received was constitutionally appropriate. Appellant's forty-ninth and fiftieth issues are overruled.

## Conclusion

Having sustained Appellant's double-jeopardy complaint, we reverse and render a judgment of acquittal for the offense charged under Count 2 of the indictment, murder in the course of committing burglary. TEX. R. APP. P. 43.2(c). Otherwise, having overruled each of Appellant's remaining issues, we affirm his murder-for-remuneration conviction under Count 1 of the indictment and corresponding sentence of imprisonment for life without parole. TEX. R. APP. P. 43.2(a).

Lawrence M. Doss<br>
Justice

Do not publish.

---

[22] Our analysis of Dixon's cumulative error argument took account of the harmless errors we assumed in this opinion as well as the double jeopardy violation and the harmless error the Court of Criminal Appeals assumed. *See Dixon,* 595 S.W.3d at 219-20 (assuming the admission of cell-site location information was error but finding it harmless beyond a reasonable doubt).